Jesse E. ATKINS, T. W. Arant, J. B. Atkins, John Auten, C. R. Bacot, Lewis Bacot, et al., Plaintiffs,

and

International Association of Fire Fighters, an International Labor Union, Plaintiff-Intervenor,

v.

CITY OF CHARLOTTE, a municipal corporation; Walter J. Black, Chief of City of Charlotte Fire Department; John E. Ingersoll, Chief of City of Charlotte Police Department; Elliott M. Schwartz, Solicitor of 14–A Solicitorial District, Defendants.

Civ. No. 2274.

United States District Court W. D. North Carolina, Charlotte Division.

Feb. 25, 1969.

J. LeVonne Charbers, Chambers, Stein, Ferguson & Lanning, and Reginald S. Hamel, Charlotte, N. C., for plaintiffs.

H. L. Riddle, Jr., Riddle & McMurray, Morganton, N. C., for plaintiff-intervenor.

W. A. Watts, Charlotte, N. C., for defendants.

William W. Van Alstyne, Durham, N. C., amicus curiae.

Before CRAVEN, Circuit Judge, and JONES and WARLICK, District Judges.

CRAVEN, Circuit Judge:

This is a civil action brought to obtain a declaratory judgment and injunctive relief declaring unconstitutional and preventing enforcement of Sections 95–97, 95–98 and 95–99 of the General Statutes of North Carolina. We hold G.S. 95–97 unconstitutional on its face. We hold G.S. § 95–98 a valid and constitutional exercise of the legislative authority of the General Assembly of North Carolina. As for G.S. § 95–99, we hold it to be so related to G.S. § 95–97 that it cannot survive the invalidation of that section.

Counsel have not been able to agree on findings of facts. We have carefully examined their separate submissions, and, although we note variances, we are more impressed with the similarities. The differences are almost entirely those of degree and emphasis, and, we think, are without legal significance. From the pleadings, answers to interrogatories, depositions, exhibits, briefs and state-

ments of counsel, the court finds the facts to be a follows:

## FACTS

The statutes sought to be invalidated are these:

N.C.G.S. § 95–97: Employees of units of government prohibited from becoming members of trade unions or labor unions.—No employee of the State of North Carolina, or of any agency, office, institution or instrumentality thereof, or any employee of a city, town, county, or other municipality or agency thereof, or any public employee or employees of an entity or instrumentality of government shall be, become, or remain a member of any trade union, labor union, or labor organization which is, or may become, a part of or affiliated in any way with any national or international labor union, federation, or organization, and which has as its purpose or one of its purposes, collective bargaining with any employer mentioned in this article with respect to grievances, labor disputes, wages or salary, rates of pay, hours of employment, or the conditions of work of such employees. Nor shall such an employee organize or aid, assist or promote the organization of any such trade union, labor union, or labor organization, or affiliate with any such organization in any capacity whatsoever. The terms "employee," "public employee" or "employees" whenever used in this section shall mean any regular and full-time employee engaged exclusively in law enforcement or fire protection activity.

N.C.G.S. § 95–98: Contracts between units of government and labor unions, trade unions or labor organizations concerning public employees declared to be illegal.—Any agreement, or contract between the governing authority of any city, town, county, or other municipality, or between any agency, unit, or instru-

mentality thereof, or between any agency, instrumentality, or institution of the State of North Carolina, and any labor union, trade union, or labor organization, as bargaining agent for any public employees of such city, town, county or other municipality, or agency or instrumentality of government, is hereby declared to be against the public policy of the State, illegal, unlawful, void and of no effect.

N.C.G.S. § 95–99: Penalty for violation of article.—Any violation of the provisions of this article is hereby declared to be a misdemeanor, and upon conviction, plea of guilty or plea of nolo contendere shall be punishable in the discretion of the court.

All of the plaintiffs are members of the Charlotte Fire Department, and the gist of the complaint is that the statutes are overbroad and prohibit constitutionally guaranteed rights of the plaintiffs in violation of the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States. Specifically, plaintiffs want to become dues paying members of a Local which would become affiliated with International Association of Fire Fighters, the intervenor. Affidavits of some 400 fire fighters of the Charlotte Fire Department have been put into evidence to the effect that, if allowed to do so by law, affiants would join the Union.

The City of Charlotte is a municipal corporation which operates and maintains the Charlotte Fire Department pursuant to the City Charter. The Chief of the Department is appointed by the City Council and is accountable to the Council for the faithful performance of his duties. He is responsible for the discipline and efficiency of the Department and for carrying out all orders, rules and regulations approved by the Council. He is also responsible for approving all promotions of members in the Department subject to the approval of the Civil Service Board.

The Department has approximately 438 employees, consisting of the Chief, two assistant chiefs, 14 deputy chiefs, 60 fire captains, and 56 fire lieutenants, with the remainder being fire fighters, inspectors, fire alarm personnel and office personnel. The plaintiffs consist of deputy chiefs, captains, lieutenants and fire fighters and range in service with the department from two to 40 years.

For many years prior to the enactment in 1959 of the North Carolina General Statutes complained of, the International Association of Fire Fighters operated or maintained a union made up of Charlotte Fire Department members and designated as Local 660, an affiliate of the International Association of Fire Fighters. A number of Fire Department members paid dues to that organization which was engaged in collective bargaining activity. Further, the City checked off dues for union membership.

During 1959, the North Carolina Legislature enacted General Statutes §§ 95–97 through 95–99. Following the enactment of these statutes, Local 660 terminated its affiliation with the International Association of Fire Fighters and became, or took the name, Charlotte Fire Fighters Association. This organization continued the activities and representations very much as had been the practice with Local 660. The Fire Fighters Association continued to negotiate with the City and to represent the Charlotte firemen with respect to wages, grievances, and other conditions of employment, and the City continued its recognition of the association and permitted dues check-off. This practice continued from 1959 until 1962. On January 29, 1962, the City Council received and approved a report compiled by the City Manager. One of the recommendations of this report as it was approved established as a condition of continued employment in the Fire Department non-membership in the Fire Fighters Association or in any successor thereto. The City Council approved this report after having been advised by the City Attorney that the Fire Fighters Association was not illegal per se under the statutes complained of, but that the association and its recognition by the City was in violation of public policies of the State. Sometime after this action on the part of the City Council, the Fire Fighters Association terminated its activities and the City discontinued its recognition and dues check-off. A grievance procedure was established to allow individual employees to process grievances, but no provisions were made for group grievance procedure or for collective bargaining with respect to grievances, wages, and conditions of employment.

During March of 1967, members of the Charlotte Fire Department, the plaintiffs herein, organized the Charlotte Firemen's Assembly. This organization has as its purpose collective bargaining with the City of Charlotte with respect to wages, grievances, hours of employment and other conditions of employment. It would like to become a local affiliate of intervenor but is prevented by the statutes. The Firemen's Assembly has not been recognized by the City as a representative of firemen.

## PROCEDURAL QUESTIONS AND PLEAS IN BAR

■ We resolve all procedural questions and pleas in bar against the defendants:

(1) As will appear more fully below, it is clear that the complaint states a claim for relief.

(2) We reject the argument that the statutes involved are within the sovereign power of the State of North Carolina under the Tenth Amendment to the Constitution of the United States and thus beyond the reach of other amendments to the Constitution. The attempted interposition of sovereignty is utterly lacking in merit, and is especially so on behalf of a municipal corporation.

(3) Contrary to Charlotte's contention, the Eleventh Amendment does not provide immunity for counties, cities or other governmental units

smaller than the states themselves. Wright, Federal Courts § 46 at 151 (Hornbook ed. 1963). Although notice of the pendency of this action was served upon the Attorney General of the State of North Carolina, he did not seek to intervene and is not a party, nor is the State.

(4) There is nothing to the contention that there is a misjoinder of parties defendant and parties plaintiff. Even if there were it would be of no moment, for the basis of jurisdiction is the presence of a federal question and not the alignment of parties under diversity jurisdiction.

(5) This case is properly before a three-judge court. The injunction is sought against the City of Charlotte, the Chief of the Charlotte Fire Department, the Chief of the Charlotte Police Department, and the Solicitor of the solicitorial district within which the City of Charlotte is located. It is true that none of these is an officer of the State of North Carolina, unless it be the solicitor of the 14–A solicitorial district, but in reaction to Ex parte Young, 209 U.S. 123, 124, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the statute, 28 U.S.C. § 2281, has been broadly interpreted so as to require three judges where the statutes attacked are general statutes of state-wide application and are reflections of state rather than local policy. City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274 (1945).

(6) The remedy of declaratory judgment is, of course, within the power of a three-judge federal court as it is within the power of a single district judge. 28 U.S.C. § 2201.

(7) Although we think if not of controlling importance, for reasons set out below, we note the urgent contention of the City of Charlotte that the court lacks jurisdiction over it under 42 U.S.C. § 1983 and 28 U.S.C. § 1343. As for Section 1983, it is said that a municipality is not a "person" within the intention of the Congress in the enactment of the statute. We agree that a municipality is not within the ambit of the statute if the action brought is one to recover monetary damages. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). But here nothing is sought of the City except a declaratory judgment binding it as to the validity of the statutes and an injunction against their enforcement. For the reasons stated by the Seventh Circuit in Adams v. City of Park Ridge, 293 F.2d 585 (7th Cir. 1961), we hold, as did that circuit, that there is federal jurisdiction over the city for the limited purposes of the complaint and excluding the recovery of monetary damages. We are of the same opinion with respect to 28 U.S.C. § 1343(3). It is not necessary with respect to the latter statute to find a congressional intent to include municipalities within the word "person" for no such word appears in Section 1343(3). It is the prior section, 1343(2), referring to monetary damages, that allows recovery only from a "person". We do not believe it was the congressional purpose in the enactment of 28 U.S.C. § 1343 to omit municipalities from subjection to suits to prevent deprivation of rights secured by the Constitution of the United States. But cf. Fisher v. City of New York, 312 F.2d 890 (2d Cir. 1963). Certainly such an intention does not plainly appear.

(8) But aside from these statutes, the plaintiffs rest their case upon a broader base: an alleged freedom of association protected by the First and Fourteenth Amendments to the Constitution of the United States. This is a federal question of constitutional dimension. Since 1875 the federal courts have been the primary forum for vindicating every right given by the Constitution, the laws and treaties of the United States. Zwickler v. Koota, 389 U.S. 241, 247, 88 S.Ct. 391, 19 L.Ed.2d 444, 449 (1967). This case, then, presents a federal question under 28 U.S.C. § 1331 and we judicially notice, if the monetary limita-

tion be deemed important[1] that the economic impact upon so many plaintiffs of the grant or denial of the right to form and join a labor union may be far greater than $10,000.

## ABSTENTION

■ It is urged upon us that in any event this court ought to abstain from decision as to the constitutionality of these statutes and either dismiss the complaint or retain jurisdiction (the better practice) to await state court determination and decision. We reject the contention. Abstention is a judge-made doctrine of comparatively recent vintage —most notably expressed in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Except as it may serve federalism, there is little justification for abstention from decision by a federal court. See Wright, Federal Courts § 52 (Hornbook ed. 1963). Although abstention remains appropriate in some situations, the proper emphasis is that of Chief Justice Marshall, who said in 1821 in Cohens v. Virginia, 6 Wheat. 264, 404, 5 L.Ed. 257, 291:

> "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution."

It is now established beyond question that the *Pullman* doctrine sanctions escape from the duty of decision only in narrowly limited "special circumstances." Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444, 450 (1967). No such special circumstances are urged upon us here. We are not asked, for example, to stop the prosecution of a criminal action already begun

in a state court—an area where federalism requires that a federal district court be slow, indeed, to act. Douglas v. City of Jeannette, 319 U.S. 157, 162–164, 63 S.Ct. 877, 87 L.Ed. 1324, 1329 (1943). It is not seriously suggested that we have here a question of construction of these statutes and that a state court might so construe them as to avoid or modify the constitutional question. Cf. Connally v. General Construction Co., 269 U.S. 385, 394–395, 46 S.Ct. 126, 70 L.Ed. 322, 330 (1926). Since there are no special circumstances that invoke a proper deference to state court adjudication, we have the constitutional duty to decide the federal questions presented. This is especially so here because the Supreme Court has squarely held that "the abstention doctrine is inappropriate for cases such as the present one where * * * statutes are justifiably attacked on their face as abridging free expression * * *." Dombrowski v. Pfister, 380 U.S. 479, 489–490, 85 S.Ct. 1116, 1122, 14 L.Ed.2d 22, 30 (1965). There is danger in tolerating "in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963). The danger is that the inhibiting effect of such a statute could be tested only by those hardy enough to risk criminal prosecution and a possible penalty of up to two years' imprisonment. Cf. Ex parte Young, 209 U.S. 123, 147, 28 S.Ct. 441, 52 L.Ed. 714, 723, 724 (1908).

The "questions of abstention and of injunctive relief are not the same." Zwickler v. Koota, 389 U.S. 241, 254, 88 S.Ct. 391, 399, 19 L.Ed.2d 444, 453 (1967). That we entertain doubt as to the propriety of an injunction, or even

[1]. 28 U.S.C. § 1331 incongruously still purports to put a $10,000.00 minimum price on federal questions. Professor Wright suggests the limitation is seldom of importance. Wright, Federal Courts § 32 (Hornbook ed.1963). "It would be unwise, as a matter of policy, to insist that

all such cases in which less than $10,000 is in controversy be tried in state court." ALI Study of the Division of Jurisdiction Between State and Federal Courts, Commentary § 1311 (Tent. Draft No. 6, 1968).

decline to issue the same, is entirely irrelevant to the question of abstention.

"We hold that a federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." Zwickler v. Koota, 389 U.S. 241, 254, 88 S.Ct. 391, 399, 19 L.Ed.2d 444, 454 (1967).

## THE CONSTITUTIONAL QUESTION AND THE REMEDY

■ We think N.C.G.S. § 95–97 is void on its face as an abridgment of freedom of association protected by the First and Fourteenth Amendments of the Constitution of the United States. The flaw in it is an intolerable "overbreadth" unnecessary to the protection of valid state interests. Cf. United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). The Supreme Court of the United States has accorded "freedom of association" full status as an aspect of liberty protected by the Due Process Clause of the Fourteenth Amendment and by the rights of free speech and peaceful assembly explicitly set out in the First Amendment. In NAACP v. Alabama ex rel. Patterson, the Court said:

"It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. [Citations omitted.] Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, *economic*, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." 357 U.S. 449, 460–461, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488, 1498–1499 (1958). (Emphasis ours.)

The Court had previously noted the close connection between the freedoms of speech and assembly. In De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278, 283–284 (1937), the Court held that the right of peaceable assembly is a right cognate to those of free speech and free press and equally fundamental. It was said that the right is one that cannot be denied without violating fundamental principles of liberty and justice which lie at the base of all civil and political institutions. The Court made a careful distinction between the proper exercise of legislative power to protect against abuse of the right of assembly and legislative infringement per se of that right, holding that the latter is not permissible. Especially pertinent to the problem confronting us is the following:

"[C]onsistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not *as to the auspices under which the meeting is held* but as to its purpose * * *." De-Jonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278, 284 (1937). (Emphasis ours.)

We would make the same distinction here. It matters not, we think, whether the firemen of the City of Charlotte meet under the auspices of the intervenor, a national labor union, but whether their proposed concerted action, if any, endangers valid state interests. We think there is no valid state interest in denying firemen the right to organize a labor union—whether local or national in scope. It is beyond argument that a single individual cannot negotiate on an equal basis with an employer who hires hundreds of people. Recognition of this fact of life is the basis of labor-management relations in this country. Charlotte concedes in its brief that the right of public employees to join labor unions

is becoming increasingly recognized[2] (with the exception of firemen and policemen)· and even admits that collective bargaining might be beneficial in many situations in the case of municipal firemen. But Charlotte insists that the State has a valid interest in forbidding membership in a labor union to firemen. It is said that fire departments are quasi-military in structure, and that such a structure is necessary because individual firemen must be ready to respond instantly and without question to orders of a superior, and that such military discipline may well mean the difference between saving human life and property, and failure. The extension of this argument is, of course, that affiliation with a national labor union might eventuate in a strike against the public interest which could not be tolerated, and the very existence of which would imperil lives and property in the City of Charlotte. This is the only state interest that can be validly asserted for N.C. G.S. § 95–97. The thought of fires raging out of control in Charlotte while firemen, out on strike, Neroicly watch the flames, is frightening. We do not question the power of the State to deal with such a contingency.[3] We do question the overbreath of G.S. § 95–97, which quite unnecessarily, in our opinion, goes far beyond the valid state interest that is suggested to us, and strikes down indiscriminately the right of association in a labor union—even one whose policy is opposed to strikes.[4]

Since the only valid state interest suggested by defendants in support of the constitutionality of G.S. § 95–97 is the quite legitimate fear that fire protection for the people of Charlotte might be disrupted by violence or by strike, it seems quite clear that the statute must be invalidated for "overbreadth."

The Supreme Court "has repeatedly held that a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." NAACP v. Alabama ex rel. Flowers, 377 U.S. 288,

2. The Charlotte Observer currently reports that city employees, including sanitation workers, have joined a national labor union.

3. Although the question is not before us, we note the position of plaintiffs, including intervenor, on the power of the State to prevent strikes and/or violent conduct on the part of a labor union engaged in vital public employment. The following Article 22 was recommended as of January 10, 1968, for incorporation in the intervenor's constitution:

"The International Association of Fire Fighters is a law abiding organization. Because of the public character of the work of its members and the protection of the lives and property of citizens and communities in case of fire and other hazard, no subordinate union or its members shall withhold fire protection services where collective bargaining, conciliation, mediation, fact finding with recommendations or voluntary binding conciliation or arbitration is available for resolution of disputes involving grievances, wages, hours or conditions of work. Where such procedures for resolving disputes are not available the subordinate union shall not withhold fire protection service but shall refer the matter to the International President and the International Executive Board for such further handling as may be available or necessary to secure an acceptable settlement of the dispute."

From the plaintiffs' brief:
The State "may quite properly prohibit employees from striking or using violence in the settlement of disputes." Milkwagon Drivers Union v. [Meadowmoor] Metamore Dairies, 312 U.S. 287, [61 S.Ct. 552] 85 L.Ed. 836 (1941).

From the intervenor's brief:
It is admitted that fire fighters' "official conduct and activities are subject to reasonable restriction by the General Assembly of North Carolina."

Our helpful and valued amicus curiae suggests that North Carolina may validly impose sanctions—even criminal ones—against strikes or other refusals to act imperiling the public safety, e.g., a statute making it a criminal offense for a fireman to refuse the call of duty; a statute providing for terminal discharge of any fireman who refuses to perform his duty.

4. See footnote 3, supra.

at 307, 84 S.Ct. 1302, at 1314, 12 L.Ed. 2d 325, at 338 (1964).

Again, "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 256, 5 L.Ed.2d 231, 237 (1960). As previously indicated,[5] the plaintiffs and intervenor do not question the power of the State to prohibit strikes against the public interest.

■ What we have said thus far supports our ultimate conclusion: that the firemen of the City of Charlotte are granted the right of free association by the First and Fourteenth Amendments of the United States Constitution; that that right of association includes the right to form and join a labor union—whether local or national; that membership in such a labor organization will confer upon the firemen no immunity from proper state regulation to protect valid state interests which are, in this case, the protection of property and life from destruction by fire. We think such a conclusion flows inevitably from the enunciations of the United States Supreme Court set out above. Our decision is consistent with that of the Seventh Circuit according the same right to teachers. McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968). We do not think the *McLaughlin* decision is distinguishable on the asserted ground that the State in that case had not undertaken to prohibit membership in a teachers' labor union. The court's recitation that there was no such state legislation went to the question of whether there was a valid state interest. It held that there was no such state interest, and that the right of a teacher to join a labor union rested upon the First Amendment to the United States Constitution.

In our case, we hold that the valid state interest may be served by more narrowly drawn legislation so as not to infringe the First Amendment.

■ We find nothing unconstitutional in G.S. § 95–98. It simply voids contracts between units of government within North Carolina and labor unions and expresses the public policy of North Carolina to be against such collective bargaining contracts. There is nothing in the United States Constitution which entitles one to have a contract with another who does not want it. It is but a step further to hold that the state may lawfully forbid such contracts with its instrumentalities. The solution, if there be one, from the viewpoint of the firemen, is that labor unions may someday persuade state government of the asserted value of collective bargaining agreements, but this is a political matter and does not yield to judicial solution. The right to a collective bargaining agreement, so firmly entrenched in American labor-management relations, rests upon national legislation and not upon the federal Constitution. The State is within the powers reserved to it to refuse to enter into such agreements and so to declare by statute.

■ G.S. § 95–99 provides that any violation of the provisions of "this article" is a misdemeanor punishable in the discretion of the court. We do not think the Legislature contemplated the criminal sanction of G.S. § 95–99 as an assurance of compliance with G.S. § 95–98. There is no way to punish a labor union or a city, town or county or other municipal corporation, (the only possible violators of G.S. § 95–98) except by fine. G.S. § 95–99 authorizes up to two years' imprisonment.[6] We doubt it was the legislative intent to authorize even a fine against North Carolina municipal corporations. Rather obviously, we think, the penalty portion of the article

---

5. See footnote 3, *supra*.

6. A misdemeanor punishable in the discretion of the court means a maximum of

two years. State v. Adams, 266 N.C. 406, 146 S.E.2d 505, N.C.G.S. 14–3(a).

was an in terrorem provision intended to make certain that no employee of the State or its subordinate municipal corporations should so much as lift a finger to form or join a labor union. Since G. S. § 95–97 has been held void, to uphold G.S. § 95–99 would be to sustain it without surviving purpose, and thus to distort the legislative intent.

 Finally, we are asked to enjoin the defendants from enforcing these statutes now adjudged to be unconstitutional, *viz.*, N.C.G.S. § 95–97 and § 95–99. We decline to do so. There has not been the slightest intimation that our decision adjudging these statutes invalid will be ignored by the City of Charlotte or by any of the other defendants. If our decision should be thought wrong, we may properly assume it will be appealed—not ignored. There is no evidence that the solicitor of the district has sought indictments against any firemen or that he intends doing so. We adhere to the philosophy of federalism and think it unseemly that a federal court should issue its injunctive process against state or local officers except in situations of the most compelling necessity. Entry of a declaratory judgment decreeing G.S. § 95–97 and § 95–99 invalid because in violation of the First and Fourteenth Amendments of the United States Constitution seems to us, on the facts of this case, a fully sufficient remedy.

Declaratory judgment granted. Injunction denied.

Addendum:

The Eighth Circuit has decided that public employees have a right, grounded in the Constitution, to join a labor union, in the absence of a "paramount public interest of the State of Nebraska or the City of North Platte [which] warranted limiting the plaintiffs' right to freedom of association." *See* American Federation of State, County, and Municipal Employees v. Woodward, 406 F.2d 137 (8th Cir. Jan. 17, 1969) (Jan. 28, 1969).