Janelle **BEAUBOEUF** and the American Federation of Teachers, Local Union #1130 AFL–CIO, Plaintiffs,

v.

**DELGADO COLLEGE** and its Board of Managers, Through Marvin Thames, President, and Seymour Weiss, Chairman of the Board and the City of New Orleans, Through Victor H. Schiro, Mayor, Defendants.

Civ. A. No. 69–407.

United States District Court

E. D. Louisiana,

New Orleans Division.

Aug. 25, 1969.

Benjamin E. Smith, New Orleans, La., for plaintiffs.

Alvin J. Liska, Richard C. Seither, Samuel R. Exnicios, New Orleans, La., for defendants.

Samuel I. Rosenberg, New Orleans, La., for intervenor.

RUBIN, District Judge:

When Isaac Delgado left the Albania Plantation to the City of New Orleans in 1912 to be used to establish a vocational training school for boys in the New Orleans public schools he could hardly have imagined that half a century after his death the institution would have evolved into Delgado College, with a faculty of 250, a student body of over 3,600 students, and, notwithstanding an annual budget of more that 2.5 million dollars, a major financial problem. But the institution that developed from the one he founded is now before the court on a request by a member of its teaching staff, Miss Janelle Beauboeuf, for an injunction against termination of her employment by Delgado and by her and her teachers' union for an injunction against harassment by Delgado of its members, including Miss Beauboeuf, because of their union activities. In addition, Miss Beauboeuf seeks damages on her claim for wrongful discharge. The union also seeks a mandatory injunction compelling Delgado and the City of New Orleans to bargain collectively with it as the exclusive representative of Delgado's teachers.

## THE EVIDENCE TO BE CONSIDERED

 Defendants protest vainly against the court's application of the letter and the spirit of the Federal Rules of Civil Procedure in the trial of the demands for an injunction. The court exercised its discretion to hear the issues relating to those demands only and, in doing so, admitted depositions taken for discovery purposes as part of plaintiffs' case, reserving to defendants the right to object to any part of the depositions and to call any persons deposed to testify at the hearing. The issue of damages

was severed and held in abeyance. In this way, the matter could proceed expeditiously, yet with full reservation of the defendants' right to supplement the record in any way they thought appropriate. The case was thus "set down for hearing at the earliest possible time" with "precedence [over] all matters except older matters of the same character." Rule 65(b), Federal Rules of Civil Procedure. It is clear that "a preliminary injunction may be granted upon affidavits. A requirement of oral testimony would in effect require a full hearing on the merits and would thus defeat one of the purposes of a preliminary injunction which is to give speedy relief from irreparable injury." Ross-Whitney Corp. v. Smith Kline & French Lab., 9 Cir. 1953, 207 F.2d 190, 198. A fortiori it is proper to hear such an application on the basis of adversary depositions together with oral testimony.

On the basis of the depositions, and the testimony of the witnesses called by defendants I find the facts to be as set forth below.

## INJUNCTION SOUGHT TO PREVENT HARASSMENT

Miss Beauboeuf was employed as a teacher by Delgado in 1966. Her contract was renewed in 1967 for the 1967–68 school year and again in 1968 for the 1968–69 school year. When the budget for the 1968–69 school year was prepared, however, the funds on hand were $200,000 less than the amount required to keep the school open for the full year. The budget was balanced, after a fashion, by listing the 55 teachers with the least seniority, including Miss Beauboeuf, as being employed to teach only through December 31, 1968.[1]

Although the financial crisis remained acute, funds became available to extend all teaching contracts through May 23, 1969. However, by March 27, 1969, the decision had been made to terminate the contracts of all teachers who did not have tenure[2] at that time. There is not an

---

1. Salary for an additional month was budgeted for each teacher to cover accrued leave.

2. Teachers with certificates are required to serve a three year probationary period before acquiring "permanent and regular"

iota of evidence of anti-union bias in this action; only five of the 91 teachers whose employment is not being renewed have been identified by the plaintiffs as union members.

For several years Delgado had been seeking recognition by the Southern Association of Colleges and Schools, a regional accreditation body. Delgado's financial problems hampered accreditation in various ways. One of the criticisms of its curriculum was "proliferation of courses"—offering more courses than it had financial resources to support. Hence when a new executive dean, Dr. John P. Dyer, was employed on July 1, 1968, he began giving attention to this and many other problems.

In late July or early August, 1968, the decision was made by the Curriculum Committee for the Division of Arts and Sciences, with Dr. Dyer's approval, that speech courses taught by Miss Beauboeuf would not be offered in the spring, 1969 semester. The final galley proof for the college catalog, delivered on September 6, 1969, contains this information. However, Miss Beauboeuf was not notified at that time of the decision to eliminate her courses.

Meanwhile the American Federation of Teachers, AFL–CIO, Local 1130 (the Union) had become increasingly active at Delgado. It sought recognition as the exclusive collective bargaining agent of the faculty. The Board of Advisors recommended its recognition, but the Board of Managers refused to enter into collective bargaining negotiations with the Union. However, the Union has appeared to represent its members in presenting grievances, and Delgado's president and other administrative officials have met with the Union's representatives to discuss any matters of concern whenever requested to do so. Delgado's policy has been to recognize the Union as a responsible body, representing its

members, but to refuse to bargain collectively with it as an exclusive bargaining agent.

In an effort to enforce its demand for recognition, the Union called a strike. It began on September 30, 1968 and lasted four days. No reduction was made in the pay of absent teachers for the first day, but their absence on October 1, 2 and 3 was considered to be unauthorized and their pay was withheld. The Delgado Board of Managers took no retaliatory action of any kind.

Shortly after the striking teachers returned to work, a memorandum was forwarded by the Dean of the Division of Arts and Sciences, Dean Stewart, to Mr. Marvin Thames, the President of Delgado, advising Mr. Thames that the Curriculum Committee recommended the exclusion of certain courses, including those taught by Miss Beauboeuf, from the schedule for the spring semester and that the teachers affected would not be needed after January 23, 1969. Miss Beauboeuf was notified of this recommendation by letter dated December 12, 1968. Mr. Thames arranged, however, for Miss Beauboeuf to be employed in the library cataloging books, and, as a result, her employment was not terminated until May 16th. While other non-tenure faculty members were retained until May 23rd, this additional week was to enable them to give and grade examinations, a task not required of Miss Beauboeuf because her courses were not being offered.

█ The evidence is convincing that the President's final recommendation to the Board of Managers with respect to Miss Beauboeuf was not motivated by anti-union animus of any kind, and that the Board's action was based solely on his recommendation. Most or all of the individual Board members sued neither knew Miss Beauboeuf personally nor had any knowledge of her union activities.

employment status. During the probationary period teachers are subject to dismissal or discharge upon the written recommendation of the superintendent of schools accompanied by valid reasons for

the action, LSA–R.S. 17:442; the grounds for removal and the procedure for removal of permanent teachers are prescribed in LSA–R.S. 17:443.

There is no. factual basis therefore on which to grant the injunction sought by Miss Beauboeuf and the Union on the ground of harassment because of union activities.[3]

## THE UNION'S EQUAL PROTECTION CLAIM

The Union seeks an injunction compelling Delgado to bargain collectively with it as the exclusive representative of Delgado's teachers. It contends that Delgado is an agency of the City of New Orleans, that the City has bargained with other labor unions representing other municipal employees, and hence that the Union is denied equal protection of the law by Delgado's refusal to bargain with it.

Louisiana prohibits public employees from striking. LSA–R.S. 23:822, 23:-861, 23:862. But Louisiana law, as interpreted by its Attorney General, neither commands municipal corporations to, nor prohibits them from, bargaining collectively with unions representing groups of municipal employees. See letter opinion filed in record.

Delgado College is an agency of the City of New Orleans. As beneficiary

under Isaac Delgado's will, it took title to the residue of the Delgado estate, the principal asset of which is Albania Plantation. A commission known as the Delgado Albania Plantation Commission, created by the City's Home Rule Charter, administers the property. The Commission is composed of the City's Director of Finance and five persons appointed by the Mayor. It transmits annually to the Board of City Trusts for the account of Delgado "such portion of the income of the plantation as may be fixed by the [City] council."

Delgado College is administered by a Board of Managers composed of sixteen members.[4] It is not a part of the Orleans Parish School system, and its affairs are not subject to the control of the Orleans Parish School Board.[5] The primary fiscal support of the college is provided by the State of Louisiana.[6] The school derives additional operational revenue from federal grants, tuition charges, and minor amounts from other sources.

Although the Union alleges that it has been denied equal protection because the City has bargained with its public employees through their respective labor

3. If Miss Beauboeuf had succeeded in proving that she was threatened with discharge because of her union activities she would have been entitled to a preventive injunction under the rationale of McLaughlin v. Tilendis, 7 Cir. 1968, 398 F.2d 287 and American Federation of State, County and Municipal Employees, AFl–CIO v. Woodward, 8 Cir. 1969, 406 F.2d 137. See also Atkins v. City of Charlotte, W.D.N.C.1969, 296 F.Supp. 1068.

4. The Board consists of the Mayor, the Director of Property Management, the Chairman of the Delgado Advisory Committee, one member of the State Legislature from the Parish of Orleans designated by the Mayor with the approval of the Council, the State Superintendent of Education and the Assistant State Superintendent of Vocational Education, one member of the Orleans Parish School Board designated by that Board, the Superintendent of the Orleans Parish School Board, all of whom are ex officio members, and eight members at large, appoint-

ed by the Mayor with the approval of the Council.

5. When Article 4, Section 12 of the Louisiana Constitution of 1921 was amended in 1948 to direct the City of New Orleans to transfer to the Orleans Parish School Board the title to any and all school property then standing in the name of the City and dedicated exclusively to school purposes, the amendment specifically provided "excepting all property of the Isaac-Delgado Central Trades School." This had the effect of leaving the title to the real property of the defendant in the City of New Orleans.

6. These include: (1) an annual appropriation of $50,000 out of the State 2½ mill ad valorem property tax. Art. XII, Section 14, La. Constitution of 1921; (2) an annual appropriation of $110,000 from revenues received from horse racing. LSA–R.S. 4:155; (3) an annual appropriation by the Louisiana legislature as part of its general appropriation bill, beginning with La. Act 2 of 1957.

unions but has arbitrarily refused to bargain with it, the evidence proves only that representatives of the City are meeting with representatives of the Teamsters Union with a view to framing a collective bargaining agreement covering sanitation workers for submission to the City Council; that the Sewerage and Water Board has entered into a collective bargaining contract with the American Federation of State, County and Municipal Employees, AFL–CIO; and that the City has negotiated labor problems with the Fire Fighters Union.[7] These facts fall short of proving a pattern of recognition of other unions by the City, nor do they prove any sort of discrimination against the Union.

The prohibitory commandment of the Fourteenth Amendment forbids the states to "deny to any person within its jurisdiction the equal protection of the laws." This is not the philosophical assertion of the Declaration of Independence that all men are created equal; it is a mandate that the law must in terms deal equally with all to whom it applies,[8] and it must treat like subjects in like manner.[9] Equal Protection further requires that the executive authorities who apply the law treat all citizens in the same manner.[10] "Though the law itself be fair on its face, and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances, material to their rights, the de-

nial of equal justice is still within the prohibition of the constitution. * * *" Yick Wo v. Hopkins, 1886, 118 U.S. 356, 374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220.

But Equal Protection is not a Procrustes bed for either legislature or executive. "Under our constitutional system the States in determining the reach and scope of particular legislation need not provide 'abstract symmetry.'" Patsone v. Pennsylvania, 232 U.S. 138, 144, 34 S.Ct. 281, 282, 58 L.Ed. 539." Skinner v. Oklahoma ex rel. Williamson, 1942, 316 U.S. 535, 539–540, 62 S.Ct. 1110, 1112, 86 L.Ed. 1655. "The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." Tigner v. Texas, 1940, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124. And even in the enforcement of criminal statutes "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation," provided "the selection [is not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." Oyler v. Boles, 1962, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed. 2d 446.

■ When a government official grants rights to some and denies them to others, this may constitute a denial of equal protection. But the executive branch is entitled no less than the legislature to reasonable discretion in handling its affairs and to a range of experiment in determining its course. Here no "intentional or purposeful dis-

---

7. The Union proved that Charity Hospital, a state agency, has a written collective bargaining contract with the American Federation of State, County and Municipal Employees, AFL–CIO, and that various other public bodies in other cities have bargained with that Union, but this activity can in no way be attributed to the City of New Orleans.

8. Vann v. Baggett, 1964, 379 U.S. 871, 85 S.Ct. 13, 13 L.Ed.2d 76; Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; State of Louisiana ex rel. Francis v. Resweber, 1947, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422.

9. See note 8 *supra*; Loving v. Virginia, 1968, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed. 2d 1010; Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Skinner v. Oklahoma ex rel. Williamson, 1942, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655; Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

10. See notes 8 and 9 *supra*; McLaughlin v. Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222.

crimination" has been shown, Snowden v. Hughes, 1944, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497. Nor have "conspicuously artificial lines" been established. Skinner v. Oklahoma ex rel. Williamson, 1942, 316 U.S. 535, 542, 62 S.Ct. 1110, 1114, 86 L.Ed. 1655.

■ Schoolteachers have been legislatively classified differently from other public employees in many ways. They have generally been accorded more favorable treatment,[11] with respect to such matters as guarantee of tenure,[12] security against discharge,[13] opportunity for leave,[14] and provision for advancement.[15] Public education is a basic function of American state and local government, and the teachers to whom this task is imparted have rightly been considered deserving of special consideration.

It is therefore not unreasonable and hence not unconstitutional for a legislature to exclude public school teachers from a public employees' labor relations act, which gives other state employees the right to bargain collectively. Minneapolis Fed. of Teachers, Local 59 v. Obermeyer, 1966, 275 Minn. 347, 147 N.W.2d 358. It would appear that equal latitude may be exercised by executive officials in determining whether they should bargain collectively with school teachers as well as with various other classes of public employees. This is particularly true when public officials are presented with a demand that one union be recognized as exclusive bargaining agent for *all* teachers, whether or not the teachers are union members. California, for example, while it commands school officials to negotiate with unions representing teachers, organizes bargaining on a proportional representation basis through a negotiating council.[16]

Control of the terms and conditions of school teachers' public employment through collective bargaining raises practical problems. Budget deadlines exist that do not confront private industry. There are financial limitations not soluble by the expedient of raising prices, which may be used by a private employer, or of raising charges, which may be pursued by those public agencies that exact a charge for their services [such as by the Sewerage and Water Board]. Defining "conditions of employment" for a teacher may involve matters of educational policy imparted by law for decision to an administrative board. And these public officials may think that public sovereignty is more important in matters of education than in connection with other municipal problems.

■ A responsible legislature or executive might well decide that to bargain collectively with unions representing school teachers is in the public interest. Conceivably, a public body might bargain so universally with unions representing other employees that the denial of the right of union representation to teachers might be considered a denial of equal protection. But no anti-union bias has been shown. Delgado has merely refused to bargain collectively with a union representing some (but not all) of its teachers. This is not a denial of equal protection of the laws.

Therefore judgment will be entered rejecting the demand for a mandatory injunction.

---

11. See LSA–R.S. 17:419 (minimum salary schedule); *id.* 17:442, 17:461, 17:471 (tenure); *id.* 17:571 et seq., 771 et seq. (retirement system); *id.* 17:1171 (leaves of absence); *id.* 17:1221 et seq. (group insurance); *id.* 17:444, 17:463 (promotions).

12. *Id.* 17:442, 17:461, 17:471. La. Act 192 of 1962 applies to Delgado specifically.

13. *Id.* 17:443, 17:462, 17:471.

14. *Id.* 17:1171–17:1217.

15. *Id.* 17:444, 17:463.

16. See Cal.Educ.Code §§ 13080–13088 (West 1966), The Winton Act, discussed in 21 Stanford Law Review 340, 348 et seq. (1969).