William T. KELLY, Plaintiff,

v.

Howard GILBERT, Assistant Attorney General of the State of Montana, Robert L. Woodahl, Attorney General of the State of Montana, and the Grand Jury of Lewis and Clark County, State of Montana, Defendants.

No. CV–76–108–BLG.

United States District Court,
D. Montana,
Billings Division.

Oct. 4, 1976. (PI)

Supplemental Order Oct. 20, 1976.

Judgment March 17, 1977.

Patrick J. Foley, Billings, Mont., for plaintiff.

Sherman V. Lohn, Missoula, Mont., for defendants.

## PRELIMINARY INJUNCTION

BATTIN, District Judge.

Presently before the Court is the question of whether to issue a preliminary injunction restraining the compelled appearance of the plaintiff before the Lewis and Clark County Grand Jury.

### *JURISDICTION.*

The jurisdiction of this Court is invoked. pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331. In the case of *Shaw v. Garrison,* 467 F.2d 113 (5th Cir. 1972), the Court found jurisdiction to enjoin a bad faith prosecution existed when "a showing of bad faith or harassment is equivalent to a showing of irreparable injury . . .." *Shaw, supra* at 120. After a full and thorough consideration of the testimony, depositions, and Grand Jury testimony before the Court, the Court finds there is sufficient evidence to invoke its jurisdiction.

### *DEPOSITIONS.*

Before reaching the issue of the prayer for a preliminary injunction, it is necessary to lay to rest some procedural questions raised by the defendants.

The defendants protest the use of depositions to establish the bases for issuing a preliminary injunction. Although there is some disagreement over the use of depositions as affidavits, an examination of the cases indicates that depositions may be considered affidavits in support of a motion for a preliminary injunction. *Illinois Migrant Council v. Pilliod,* 398 F.Supp. 882, 886

(N.D.Ill.1975), at fn. 4, and cases cited therein; *Beauboeuf v. Delgado College,* 303 F.Supp. 861 (E.D.La.), affirmed on other grounds, 428 F.2d 470 (5th Cir. 1970). Further ground for using the depositions produced in this case is found in the convenience afforded both the Court and counsel by their use. Although many of the deposed witnesses were present in the Helena Courtroom at the last hearing on this matter, September 27, 1976, the fortuitous circumstance of the Court sitting in Helena does not preclude the use of the depositions. The witnesses were subject to cross-examination at the time the depositions were taken, and, but for the fact that the Court happened to be in Helena at the time, would have been a great distance from the Court sitting in Billings. Finally, during the pendency of this action, the Court has been heavily involved in a trial calendar which would have had to have been postponed if the manner of proceeding here was not followed.

The defendants' protestation against the use of the deposition is in vain. The use the Court has made of these testimonial devices is entirely within the rule and spirit of the Federal Rules of Civil Procedure. *Beauboeuf v. Delgado College, supra* at 862.

*Preliminary Injunction is the Appropriate Remedy.*

■ A preliminary injunction is a remedy which should be granted only when the facts warrant its issuance, but even then it should be issued only with the exercise of sound discretion. *General Electric Co. v. American Wholesale Co.,* 235 F.2d 606, 608 (7th Cir. 1956).

■ A party seeking a preliminary injunction must satisfy four requirements: (1) A reasonable probability of success on the merits; (2) irreparable injury for which there is no adequate legal remedy; (3) the movant must show that others will not suffer serious adverse effects as a consequence of the preliminary injunction; and (4) the Court must weigh the effects of the requested order on the public interest. *Illinois Migrant Council v. Pilliod, supra* at 901.

■ It is not necessary to show the absolute certainty of success to meet the first requirement for issuance of the preliminary injunction. *Held v. Missouri Pac. R. Co.,* 373 F.Supp. 996 (D.C.Texas, 1974). The court finds that in this case the burden of showing a reasonable probability of success based on the evidence now before the Court has been shown. It is enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair basis for litigation and thus a more deliberate investigation. *Held v. Missouri Pac. R. Co.,* supra at 1003.

A showing of bad faith or harassment is equivalent to a showing of irreparable injury because there is a Federal right to be free from bad faith prosecution. *Shaw v. Garrison,* 467 F.2d 113, 120 (5th Cir. 1972). Despite the defendants' contentions of *res judicata,* which is not applicable here, the allegations of bad faith and harassment contained herein are raised now for the first time only *after* the granting of transactional immunity to the plaintiff in the Grand Jury proceedings. There is sufficient showing of harassment and bad faith to sustain the issuance of the preliminary injunction.

The issuance of the preliminary injunction will have no serious ill consequence on any other party.

In weighing the final consideration, the effect of the requested order on the public interest, the Court must balance the state's interest in proceeding with the Workmen's Compensation investigation against the plaintiff's right to be free from bad faith prosecution and purported harassment. The Grand Jury here is under no time limitation and its authority to investigate will not expire in the immediate future. Nor will its investigative powers be appreciatively thwarted pending a final consideration of the merits of this action. Any period of delay caused by the issuance of a preliminary injunction would not be so great as to hamper the orderly procedure of the Grand Jury.

The plaintiff has much more to lose if he is continually brought before the Grand Jury and questioned on grounds substantially different, at the most remotely related, from the reasons he was given immunity from prosecution so as to compel his testimony. The equitable balance favors the plaintiff, and therefore the preliminary injunction should issue.

Therefore, IT IS ORDERED that the defendants and all persons acting by, through, and for them, be and they hereby are restrained, by this preliminary injunction, from proceeding in matters before the Grand Jury of Lewis and Clark County, relative to William T. Kelly, and they are further restrained from enforcing the subpoena and subpoena duces tecum commanding William T. Kelly to appear before the Grand Jury pending a final consideration of the merits in this action.

An Opinion and Order setting forth the bases and reasoning of the Court for the issuance of the preliminary injunction will follow this order.

## SUPPLEMENTAL OPINION

On October 4, 1976, this Court entered a preliminary injunction in this case, restraining the defendants

". . . from proceeding in matters before the Grand Jury of Lewis and Clark County, relative to William T. Kelly, and they are further restrained from enforcing the subpoena and subpoena duces tecum commanding William T. Kelly [the plaintiff herein] to appear before the Grand Jury pending a final consideration of the merits in this action."

This opinion and order supplements the October 4, 1976, order of this Court.

### I.

Rule 65(d), Federal Rules of Civil Procedure, requires a Court granting an injunction or restraining order to set forth the reasons for its issuance with some specificity and to reasonably describe the acts sought to be restrained. See *Hunter v. United States,* 388 F.2d 148, 155 at n. 6 (9th Cir. 1967). The October 4, 1976, order was granted after a full consideration of the evidence before the Court. The reasons for the preliminary injunction are set forth now.

This case involves an attorney who was compelled to appear and to testify before a county grand jury investigating official misconduct and criminal acts alleged to have occurred in Lewis and Clark County, Montana. He now seeks to avoid any further compelled appearance before that body, alleging that the state's design in any more grand jury appearances by him is to lay the foundation for a perjury indictment. To this end the plaintiff alleges a violation of his civil and constitutional rights caused by the bad faith and harassing activities and conduct of the state's special prosecutors and the state's Attorney General. The complaint charges that the alleged bad faith and harassment and the design to indict him for perjury are motivated by a desire of the Attorney General, and his staff, to advance the Attorney General's political ambitions.

Any political motive fostering acts which have transpired and which support the issuance of the preliminary injunction in this case is not an issue before the Court. What is at issue is whether the plaintiff has shown by the evidence a reasonable likelihood of success in proving harassment, or bad faith prosecution or some other extraordinary circumstances showing irreparable injury. *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975); *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971).

### II.

The facts as developed in this case do not raise the simple issue of whether a state can compel the testimony of one of its citizens. Certainly it can. One need only look to the parallel of the Federal grand jury system, the model from which the state grand jury system is derived, to find a strong statement that "the public . . . has a right to every man's evidence". *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090,

3108, 41 L.Ed.2d 1039 (1974), citing *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), and cases cited therein. The principle of binding a witness to give testimony to a grand jury has long been accepted in America and even antedates the Republic. *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). But, can the state use *any* means at its disposal to compel that testimony? Can the state compel the testimony of an individual through harassment and intimidation of witnesses? Can the state compel the appearance of one of its citizens under the ostensible guise of the inquisitorial function of the grand jury and ultimately use that process to elicit purportedly perjurious statements, remotely related, if relevant at all, to the scope and function of that investigatory body? Regardless of what the state's position is with respect to any of its citizens, that position and the process employed in dealing with its citizens must always and foremost be couched in the due process of law.

The contextual perspective of this case stems from a litany of legislative and court actions spanning nearly three years. In the abstract, the circumstances of the unwillingness of an individual to testify before a county grand jury may not raise the extraordinary immediate need for federal equitable relief sufficient to set aside the federal and state relationship "poignantly described by Justice Black as 'Our Federalism'." *Helfant v. Kugler,* 500 F.2d 1188, 1197 (3rd Cir. 1974), vacated and remanded 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975). Yet when considered in the total context of the Workmen's Compensation investigation, the unwillingness of the plaintiff to further appear rings louder than the mere statement of a highly unusual factual situation. *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975).

A brief history of what has occurred in the investigation leading up to the instant case is necessary to properly understand the plaintiff's position.

In 1967, the Montana State Legislature enacted legislation providing for a bipartisan audit committee obligated to audit every state agency at least once each biennium. Section 79–2304, R.C.M.1947. The legislation directed the appointed auditor to

"Report immediately in writing to the attorney general . . . any apparent violation of penal statutes disclosed by the audit of a state agency, and furnish the attorney general all information in his possession relative to the violation." Section 79–2310(3), R.C.M.1947.

In 1973 an audit was performed by the legislative auditor of the accounts and operations of Montana's Workmen's Compensation Division, Department of Labor and Industry. This audit revealed evidence that widespread criminal activity had occurred in Workmen's Compensation Division matters. These irregularities were duly reported to the legislative committee and to the Attorney General. The revelations were later characterized by the Montana Supreme Court as

". . . a sorbid [sic] web of ethical and criminal violations involving numerous individuals, both official and unofficial." *State ex rel. Woodahl v. District Court of First Judicial District,* 166 Mont. 31, 45, 530 P.2d 780, 788 (1975).

At the time, the state had no statute authorizing the Attorney General to prosecute any crime so revealed. Consequently, the Forty-third Montana Legislative Session enacted Section 1, Chapter 4, Laws of 1974, providing that:

"The attorney general shall conduct on behalf of the state, all prosecutions for public offenses disclosed by an audit of a state agency performed by the legislative auditor." Section 79–2315, R.C.M.1947.

In 1975, a second section was added to this law, Section 1, Chapter 458, Laws of 1975, ostensibly directed at all professional persons but ultimately reflecting the climate and atmosphere surrounding the Workmen's Compensation Division investigation. The amendment requires:

"In any action, taken by the attorney general . . . under this section, wherein any professional person in the state of Montana is charged, or may have

engaged in unethical conduct, all records, or certified copies of such records, including investigative materials, shall be turned over to the appropriate disciplinary authority of his or her profession immediately upon completion of the action." Section 79–2315, R.C.M.1947.

During the intervening year, the Attorney General's staff, with the addition of special prosecutors from both within and without the State of Montana, investigated, prepared and prosecuted a number of Workmen's Compensation-related matters. To this end the state proceeded without the aid of a grand jury but by the usual process followed in Montana of filing criminal informations against the respective defendants.[1] The investigation led the Attorney General and his staff into both the private and the public sectors. As the investigation became more intense, persons connected with it resisted and refused the requests and demands made upon them by the Attorney General's staff to reveal and disclose material facts and evidence relating to the investigation.

"It was therefore determined by the attorney general that a grand jury must be empaneled to call and command reluctant witnesses to appear and produce evidence so that the responsible individuals can be prosecuted and to exonerate those individuals who are suspected of committing criminal offenses but who have not done so, according to the evidence, or where evidence is inadequate to merit initiation of criminal proceedings." *State ex rel. Woodahl v. District Court, supra* at 35, 530 P.2d at 783.

October 18, 1974, the state Attorney General petitioned the judges of the First Judicial District to empanel a grand jury in Lewis and Clark County, Montana. November 27, 1974, the Attorney General's request was denied because the district

judges felt such an extraordinary step was unnecessary. The order of the district court denying the request was based on a number of factors now set forth: (1) That the Attorney General was in the process of diligently investigating and prosecuting alleged violations; (2) that the Attorney General had full subpoena powers as a special agent of the Legislature; (3) that the information which would be the subject of any grand jury inquisition had been evaluated by experts and ordinary citizens would "impede" the investigation rather than "expedite" it; (4) a grand jury would be a financial burden on the people of the county; and (5) that a county grand jury could not investigate a statewide matter.

The Attorney General then sought a writ of supervisory control from the Montana Supreme Court, attempting to set aside the District Court ruling. The writ was granted and the judges of the First Judicial District were ordered to empanel the grand jury that is a subject of the present action. *State ex rel. Woodahl v. District Court,* 166 Mont. 31, 46, 530 P.2d 780 (1975). The grand jury and the special prosecutors associated in the presentation of evidence before that body are thus operating under a mandate from the state's highest court.

### III.

The history of much of the litigation concerning the attempts of the Lewis and Clark grand jury to compel the testimony of the plaintiff in this case is set forth in the case of *Kelly v. Grand Jury of Lewis and Clark County et al.,* Mont., 552 P.2d 1399, 33 St.Rept. 739 (1976). From that and the pleadings and evidence in this case, the following facts are established.

Kelly was subpoenaed to appear before the Lewis and Clark County grand jury on May 18, 1976. As a result, he filed an

1. The dearth of grand jury activity in Montana's criminal justice system has been lessened somewhat since the beginning of the Workmen's Compensation investigation. Nonetheless, a grand jury is still an unusual process in Montana for starting the criminal processes. Quoting from page 25 of the transcript of the hearing of September 10, 1976, lines 16 to 19: "THE COURT: Thank you. Perhaps for the purpose of my own edification, grand juries in the state courts in Montana are unusual, they are not usual; is that correct? MR. LOHN: That is correct, Your Honor."

action against the grand jury and the Attorney General in the state district court and moved to quash the subpoenas. A hearing·was set for the district court, but before it could be held the Attorney General sought and obtained a writ of supervisory control. This writ set aside and vacated the district court order. *State of Montana ex rel. Woodahl v. District Court*, Mont., 553 P.2d 971, 33 St.Rept. 537 (1976). The Montana Supreme Court annulled the district court order because of

". . . the absence of a sworn statement of applicant, an affidavit, or supporting documents legally sufficient to support issuance of said orders." *State ex rel. Woodahl v. District Court, supra*, 553 P.2d at 972, 33 St.Rept. at 538.

The matter was then remanded to the grand jury of Lewis and Clark County for continuation of such further proceedings as the grand jury deemed appropriate.

Kelly subsequently filed an action in the United States District Court for the District of Montana, Helena Division, requesting the calling of a three judge court and the issuance of a temporary restraining order. On May 24, 1976, the Federal District Court entered an order denying both requests. *Kelly v. Grand Jury of Lewis and Clark County, et al.* (D.Mont., No. CV–76–55–H, May 24, 1976).

June 24, 1976, a special assistant Attorney General again filed in the District Court an affidavit and motion to compel the testimony of Kelly before the grand jury. The same day, the district court judge issued a subpoena and a subpoena duces tecum ordering the plaintiff herein to testify before the grand jury and to produce certain physical evidence for the grand jury, the return date being July 7, 1976. Kelly then filed another writ of prohibition in the Montana Supreme Court, seeking to vacate the subpoenas until a hearing could be held on the legality and jurisdiction of the grand jury. *Kelly v. Grand Jury*, Mont., 552 P.2d 1399, 33 St.Rept. 739 (1976). This time, the motion to quash the subpoenas was supported by affidavit and verified. On July 1, 1976, the Montana Supreme Court set the

matters for oral argument and stayed all proceedings in the district court. The parties argued the case and it was taken under advisement by the Supreme Court on July 7, 1976. The Montana Supreme Court entered an order on July 26, 1976, denying the writ of prohibition and upholding the district court subpoenas to compél testimony and produce evidence. *Kelly v. Grand Jury*, Mont., 552 P.2d 1399, 33 St.Rept. 739, 744 (1976).

The plaintiff had raised many of the same issues concerning the conduct of the assistant Attorney General that are the subject of this action in the July 7 petition, but none was addressed by the Montana Court, nor was any factual determination made in the district court. This fact is pointed out in the dissenting opinion of Mr. Justice Daly.

"Mr. Justice Gene B. Daly dissenting:
 "I dissent.

 "I do not disagree that some of the matters raised by the petitioner may be premature. He may not be considered a prospective defendant. The transactional immunity may protect all of his rights from unlawful invasion. He may or may not have standing to object in his present posture. However, my problem arises from the fact that we are making a fact determination without a proper record. These facts should be determined by the district court upon a hearing before the district court. It would be my position that if the petitioner claims a violation of a constitutional right by a proper petition before the district court, he has standing to be heard and his complaint determined by that court. There is never any unnecessary delay in granting the right to be heard on any legitimate motion before any court in a judicial proceeding."

It is important to interject at this point that Kelly did appear before the grand jury on May 25, 1976. At that appearance he asserted various privileges accorded him by the Federal and State Constitutions and Montana statutes.

During the period before his next compelled appearance, he was given transac-

tional immunity by the district court. This immunity was contested by Kelly, but the challenge was laid to rest by the Montana Supreme Court in its July 26, 1976, opinion where it held:

". . . the district court's order to compel testimony pursuant to Section 95–1807 effectively granted relator transactional immunity from prosecution." *Kelly v. Grand Jury et al., supra*, 552 P.2d at 1402, 33 St.Rept. at 742.

Kelly was thus ordered to appear before the Lewis and Clark County grand jury. On August 16, Federal Judge W. D. Murray entered an order dismissing the grand jury as a defendant in Cause No. CV–76–55–H and again denied Kelly's request for a stay of his appearance before the grand jury.

August 17, 1976, Kelly appeared before the grand jury but refused to produce his attorney case files until his own attorney could verify the authorizations of Kelly's clients allowing the release of privileged information. He produced the information, over objection, when he was ordered to do so by the state district court judge. At the same appearance, he also refused to testify until again ordered to do so by the district judge. His testimony was eventually given on the basis of immunity granted by the district judge pursuant to 95–1807, R.C.M., 1947. Kelly then testified August 17, 1976, and the morning of August 18, 1976.

After the refusal of Judge Murray to stay further proceedings before the grand jury, Kelly's attorney filed an immediate appeal seeking an emergency stay pursuant to Rule 6(g), Ninth Circuit Appellate Rules and General Order No. 3. At 10:00 o'clock a. m., August 18, 1976, in Boise, Idaho, Federal Circuit Judge J. Blaine Anderson heard oral presentation of appellant's emergency motion for a stay. Kelly's attorney argued for him and Thomas A. Budewitz appeared for the Attorney General. Judge Anderson issued an order for temporary stay with some reservation:

"While the undersigned entertains grave doubts as to the standing of appellant with respect to the relief he seeks, the issues are of sufficient importance and significance as to require the motions panel of this Court to give consideration thereto, especially where it is conceded by the Deputy Attorney General that a brief stay will not impede in any way any litigation now pending in the District and Supreme Courts of the State of Montana." *Kelly v. Grand Jury, et al.*, No. 76–2822 (August 18, 1976).

The stay was extended until August 24, 1976, at 5:00 o'clock p. m.

On August 23, 1976, the motions panel of the Ninth Circuit Court of Appeals denied Kelly's motion for a stay of further appearance before the Lewis and Clark grand jury because there was

". . . no basis for Federal jurisdiction *presently* appearing." *Kelly v. Grand Jury, et al.* (No. 76–2822, Order of August 23, 1976). (Emphasis added.)

Thereafter, William Kelly appeared again before the Lewis and Clark grand jury on August 26, 1976. But because of the nature of the questions, Kelly refused or was unable to give direct answers. During a recess of that appearance, defendant Gilbert, who was then conducting the proceedings before the grand jury, approached Kelly and spoke with him about the proceeding and other matters. Kelly's attorney was not present.

Another appearance of Kelly before the grand jury was scheduled for September 1, 1976. On August 31, 1976, at 4:45 o'clock p. m., this Court entered a temporary restraining order staying that appearance. The temporary restraining order was to expire at 4:45 o'clock p. m. September 10, 1976. On that day, a hearing was held and the temporary restraining order extended an additional period of time by agreement of counsel to so extend the stay. A second hearing was held in Helena, Montana, September 27, 1976, at which time more argument and evidence in the nature of testimony and depositions was presented to the Court. The preliminary injunction of this Court, restraining further compelled appearance of Kelly before the Lewis and Clark grand jury, was entered October 4, 1976, pending a hearing on the merits of the case.

## IV.

Before proceeding, it is necessary to address the question raised by the defendants concerning the use of depositions to establish the bases for issuing a preliminary injunction.

 Although there is some disagreement over the use of depositions as affidavits, an examination of the cases indicates that depositions may be considered affidavits in support of a motion for a preliminary injunction. *Illinois Migrant Council v. Pilliod,* 398 F.Supp. 882, 886 (N.D.Ill.1975) at n. 4, and cases cited therein; *Beauboeuf v. Delgado College,* 303 F.Supp. 861 (E.D. La.), affirmed on other grounds, 428 F.2d 470 (5th Cir. 1970). The rule in this Circuit is that the trial court in its discretion may grant or deny the preliminary injunction on affidavits. *San Francisco-Oakland Newspaper Guild et al. v. Kennedy,* 412 F.2d 541, 546 (9th Cir. 1969); *Hoffritz v. United States,* 240 F.2d 109 (9th Cir. 1956); *Ross-Whitney Corp. v. Smith Kline & French Laboratories,* 207 F.2d 190 (9th Cir. 1953).[2] These cases do not hold that oral testimony is never required. Rather, the district court's use of the affidavits and depositions in place of oral testimony is sound when witnesses are not immediately available, the

facts are complex, a great deal of time would be required for an evidentiary hearing, and the Court has concluded that relief can properly be granted on the affidavits and depositions alone. See *Aguirre v. Chula Vista Sanitary Service and Sanitainer, Inc.,* No. 76–1039, 542 F.2d 779, at 787 (9th Cir. 1976). All of those factors exist in the present action.

 Further justification for using the depositions produced in this case is found in the convenience offered both the Court and counsel by their use. Although some of the deposed witnesses were present in the Helena Courtroom at the September 27, 1976, hearing, the fortuitous circumstance of the Court sitting in Helena does not preclude the use of the depositions. The witnesses were subject to cross-examination at the time the depositions were taken, and, but for the fact that the Court happened to be in Helena at the time, would have been a great distance from the Court sitting in Billings. Finally, during the pendency of this action, the Court has been actively involved in a monumental calendar which would have had to have been postponed if the manner of proceeding here was not followed.[3]

**2.** *Contra,* see *Sims v. Greene,* 161 F.2d 87 (3rd Cir. 1947).

**3.** During the pendency of this matter, a sampling of Judge Battin's court calendar and duties (excluding the time necessary for correspondence and telephone communication with district and circuit court judges as well as with counsel and other persons connected or not connected with the Court) included in part the following:

*Wednesday,* September 1, 1976: Sentencing of two juveniles; further proceedings in a criminal case; a final pretrial conference in a civil case; reading and signing five orders and two criminal judgments, and reading five memoranda from his law clerk.

Sept. 2: Two arraignments; one final pretrial conference; a conference with counsel in Chambers; a discussion on a petition for a writ of habeas corpus ad prosecutum; a discussion on a possible injunction; reading and signing two orders.

Sept. 3: Hearings in three criminal cases; hearing returns on five criminal summons, with trial settings; reading and signing two orders.

*Tuesday,* Sept. 7: Return on one criminal summons; one arraignment and plea; two initial appearances; two criminal juries picked, with second excused until Sept. 9; jury trial commenced, criminal; read and signed seven orders; read three memoranda from law clerk.

Sept. 8: Discussion re settlement of a case; hearings on motions for summary judgment in two cases; second day of criminal jury trial; hearing on issues in civil case; probation revocation hearing and order for defendant to be sent to institution for observation and study; reading and signing nine orders.

Sept. 9: Hearing return on a criminal summons; a preliminary pretrial conference; read and signed four orders; begin civil jury trial; read two memoranda from law clerk on pending cases.

Sept. 10: Two criminal sentencings; a preliminary pretrial conference; a telephone pretrial conference call; hearing motions in two cases; hearing motion for preliminary injunction; read and signed six orders.

*Monday,* Sept. 13: An arraignment and plea; hearing change of plea; hearing civil motion; picking jury for civil trial and for criminal trial;

## V.

The jurisdiction of this Court is invoked pursuant to Titles 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).[4]

Section 1983 of Title 42 provides:

"*Every person who, under color of any statute*, ordinance, regulation, custom or usage of any State . . . *subjects*, or causes to be subjected, *any citizen of the United States* . . . *to the deprivation of any rights,* privileges or immunities *secured by the Constitution* and laws, shall be liable to the party injured in an action at law, *suit in equity*, or other proper proceeding for redress." 42 U.S.C. § 1983 (Emphasis added).

The United States District Courts have original jurisdiction of any civil action commenced by a person to redress the deprivation, under color of state law, of any right secured by the Constitution of the United States. 28 U.S.C. § 1343(3).

Jurisdiction in this case is proper if the defendants are acting under color of state law to deprive the plaintiff of rights secured to him by the United States Constitution. There is no requirement of a jurisdictional amount.

The authority of the Attorney General to compel the testimony of Kelly is predicated on Section 79–2315, R.C.M., 1947, which commands the Attorney General to prosecute crimes disclosed by the audit of the Workmen's Compensation Division, and the grand jury ordered by the Montana Supreme Court. *State ex rel. Woodahl v. District Court*, 166 Mont. 31, 530 P.2d 780 (1975). In the case of *Goldman v. Olson*, the Federal District Court in Wisconsin found a resolution of the Wisconsin State Senate creating a committee to investigate "riotous and unlawful activities" on a college campus constituted the color of state law for purposes of 42 U.S.C. § 1983. *Goldman v. Olson*, 286 F.Supp. 35, 39 (W.D.Wis. 1968). If a resolution passed by one house

read and sign two orders; read four memoranda from law clerk.

Sept. 14: Hearing petition for removal from state court; preliminary pretrial conference; hearing on order to show cause; hearing on removal, claim and delivery; read and sign ten orders; read and sign criminal judgment and criminal judgment and commitment; read two memoranda from law clerk. Commence civil jury trial.

Sept. 15: Three preliminary pretrial conferences; continuation of civil jury trial; read and sign five orders; read memorandum from law clerk;

Sept. 16: Hearing return on criminal summons; a sentencing; read and sign six orders; three preliminary pretrial conferences; fourth day of civil jury trial.

Travel out of state 9–17 to 9–20; one order signed by previous order of the Court; before leaving, read and signed six orders; read a memorandum from law clerk.

Sept. 21: Travel to Helena, Montana.

*Wednesday*, Sept. 22: Hearing motion in civil case; final pretrial conference; picking jury for and commencing trial of civil case; read and signed twelve orders; read memorandum from law clerk.

Sept. 23: Hearing motion for default; continue civil jury trial; read and signed two orders;

Sept. 24: Continue civil jury trial; read and signed four orders.

*Monday*, Sept. 27: Hearing civil motion; continue civil jury trial.

Sept. 28: Hearing civil motion; continue civil jury trial.

Sept. 29: Continue civil jury trial; hearing jury verdict.

Sept. 30: Return to Billings from Helena.

*Friday*, Oct. 1: Two orders signed by order of the Court.

*Monday*, Oct. 4: Returns heard on criminal summonses: to be continued; six criminal sentencings; read and signed 14 orders.

Oct. 5: Three hearings on returns on criminal summons; hearing motion to quash; read and signed four orders; read two memoranda.

Oct. 6: Conference with attorneys and scheduling final pretrial conference re criminal case; conference return on criminal summons delayed because of late arrival.

Oct. 7: 5 juvenile delinquency hearings, with conferences with counsel and sentencings set for Nov. 12; hearing returns on juvenile delinquency summons, sentencings set for Nov. 12. Read and signed three criminal judgments and one criminal judgment and commitment.

Oct. 8: A criminal sentencing; a change of plea with sentencing set for Oct. 28; a preliminary pretrial conference; three juvenile delinquency hearings; read and signed one order.

4. In the October 4, 1976, order granting the preliminary injunction, it was erroneously stated that jurisdiction was invoked pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Section 1343(3) of Title 28 properly grants district courts jurisdiction in cases brought under 42 U.S.C. § 1983.

of a bicameral legislature directing an investigation is sufficient to establish jurisdiction under 42 U.S.C. § 1983, then a state law commanding the prosecution of crimes revealed by a legislative audit must also wrap the proceedings so undertaken with the "color" of state law. The grand jury operates under color of state law as it is a statutorily created investigatory body and, in this case, is mandated by the state's high court. *State ex rel. Woodahl v. District Court, supra.*

There are two facts necessary to satisfactorily complete the jurisdictional requirements. First, that the plaintiff has a constitutionally protected right which is involved in this action. Secondly, that the activities of the grand jury, the special prosecutors, and the Attorney General are in some way involved here in depriving the plaintiff of that right.

The essence of the plaintiff's claim is that he is being denied the due process of law both in the way the grand jury inquisition is being conducted and in the way his objections to that conduct have been handled by the state courts. Count III of the complaint alleges that unless the plaintiff testifies before the grand jury in a manner satisfactory to defendant Gilbert, he will face charges of contempt and indictment for perjury. The Fifth Count of the complaint asserts that the plaintiff is being denied due process of law by the bad faith use of the grand jury to inquire into matters beyond the scope and power of the grand jury. Count VII of the complaint asserts a violation of the plaintiff's due process rights by the conduct of the special prosecutors in the conferences and statements made to the grand jury off the record when the court reporter is excluded. Finally, Count VI of the complaint alleges that the plaintiff is denied the due process of law by the Montana courts in that he has never been allowed an evidentiary hearing, at the district or appellate level, on the constitutional and statutory rights he claims are being violated by the state's prosecutorial authorities.

■ Undeniably, the constitutional right of due process, guaranteed to an individual by the Fourteenth Amendment, includes the right to fair process of indictment and trial and must inhere in criminal proceedings brought against an individual by the state. *Luongo v. Wenzel,* 404 F.Supp. 874, 879 (E.D.N.Y.1975). A claim involving a denial of this fair process is normally presented in an impartial state judicial process with the inherent safeguards in that system to guarantee the due process of law. As an element of the state's fair process there must be some sort of evidentiary hearing, especially in the context of the allegations made here: that the state system designed to insure due process of law is in fact being used to harass and intimidate a citizen unwillingly involved in the system and deprive him of fair dealing. See *Kelly v. Grand Jury,* 552 P.2d 1399, 33 St.Rept. 739, dissenting opinion, Justice Daly, at 749.

■ The necessity of a constitutional right sufficient to invoke federal jurisdiction under 42 U.S.C. § 1983 is established by an allegation that the state's criminal process for returning an indictment is being used to deprive the plaintiff of the due process of law, when the plaintiff has been denied an evidentiary hearing on those claims by the state courts.

The final requirement necessary to invoke federal jurisdiction under 42 U.S.C. § 1983 involves the deprivation of a constitutional right by some person acting under color of state law.

The defendant cites a case from this Court for the proposition that it is the policy of the Federal Courts in this District to ". . . not now or in the future halt for a week, a day, or an hour any criminal proceeding in a Montana court because of the inconvenience and embarrassment [footnote omitted] that a particular trial causes a particular defendant." *Cline v. State of Montana,* 394 F.Supp. 803, 804 (D.Mont.1975).

That is still the policy of this Court, but the *Cline* case is inapplicable to the case at hand. In *Cline,* the petitioner sought to

enjoin a state *prosecution.* There is no prosecution to enjoin in this case as Kelly has not yet been indicted. For the same reason, the holding of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) is inapplicable to this case. See *Anderson v. Nemetz,* 474 F.2d 814 (9th Cir. 1973).

▆ Nonetheless, the concept of Federalism must be addressed since

"*Ex parte Young* [209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714] . . . and following cases have established the doctrine that when absolutely necessary for protection of constitutional rights courts of the United States have power to enjoin state officers from instituting criminal actions. But this may not be done except under extraordinary circumstances where the danger of irreparable loss is both great and immediate." *Fenner v. Boykin,* 271 U.S. 240, 243, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926).

*Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and cases following are factually inapposite to the present case. In those cases, a state was seeking to enforce a statute which was then challenged on constitutional grounds in a three judge Federal Court. Thus, the use of *Dombrowski* is limited to matters not directly in the holding of that case. Actions initiated under Section 1983 are exempted from the federal anti-injunction statute, 28 U.S.C. § 2283, as are those actions wherein there is no federal prosecution pending. *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *Concerned Consumers League v. O'Neill,* 371 F.Supp. 644 (E.D.Wis.1974).

The long standing policy of equitable restraint expressed in *Younger v. Harris* was addressed in *Kugler v. Helfant, supra,* 421 U.S. at 124, 95 S.Ct. 1524. That case is similar to the present action in some respects. There Helfant brought an action under 42 U.S.C. § 1983 seeking to enjoin the Attorney General of New Jersey and other New Jersey officials from prosecuting an indictment pending against him in that state. His complaint alleged that his testimony before a grand jury was coerced by members of the New Jersey Supreme Court. Two months after his grand jury appearance, Helfant was indicted for several crimes, including four counts of false swearing. The federal complaint alleged that federal injunctive relief was necessary because it would be impossible for Helfant to receive a fair trial in the New Jersey state courts.

The federal policy of equitable restraint is founded on the premise that ordinarily a pending state prosecution provides a fair and adequate opportunity for a defendant to vindicate federal constitutional rights. The *Kugler* Court found:

"Only if 'extraordinary circumstances' render the state court incapable of *fairly and fully adjudicating* the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process. The very nature of 'extraordinary circumstances,' of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings. [Footnote omitted.] But whatever else is required, such circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation." *Kugler v. Helfant,* supra at 124, 95 S.Ct. at 1531.

▆ The scope of the exception to the general rule of federal equitable restraint for "other extraordinary circumstances" has been left largely undefined by the Supreme Court. *Kugler v. Helfant, supra* at 125, n. 4, 95 S.Ct. 1524. But the facts and circumstances of this case fall in that exception. The extraordinary circumstance here is that Kelly claims the measures designed to ensure due process, the grand jury proceedings and the state court system, are being used to deny him due process. Unlike the petitioner in *Kugler,* Kelly has no single state proceeding available to vindicate his federal constitutional rights. Furthermore,

when the same issues raised here were presented to the state court, Kelly was not given an evidentiary hearing nor were the issues addressed by the State Supreme Court. *Kelly v. Grand Jury,* 552 P.2d 1399, 33 St.Rept. 739.

This case falls within the scope of the exception to the general rule of equitable restraint. *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975). The allegations of the plaintiff, supported by affidavit, satisfy the requirement of 42 U.S.C. § 1983 that a deprivation of constitutional rights is extant by one acting under color of state law. The allegations of bad faith and harassment support the invocation of federal jurisdiction as do the extraordinary circumstances and facts involved in the case.

Jurisdiction exists in this Court and the plaintiff has standing to pursue the action.

## VI.

The defendant urges the matters involved in this case have already been determined in a state court action. The record fails to support this allegation. There is no evidence of any evidentiary hearing on the claims raised herein other than the hearing before this Court. Furthermore, the facts constituting the gist of the complaint arise from the August 26, 1976, appearance of Kelly before the grand jury and the previously granted transactional immunity.

## VII.

The gravamen of the plaintiff's claim is that defendant Gilbert is attempting to lay the groundwork for a perjury indictment against Kelly. Because the complaint involves grand jury testimony, it is necessary to briefly examine the Montana grand jury system and to discuss the concept of transactional immunity.

As an institution of Anglo-Saxon justice, the origins of the grand jury go back to antiquity. See discussion, *United States v.*

*Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); *Porter v. District Court,* 124 Mont. 249, 257, 220 P.2d 1035 (1950). The Montana grand jury system is patterned after the Federal system which grew out of the grand jury in medieval England. The system of grand juries was designed as a protector of the rights of the government. At the same time, the grand jury system became a part of the criminal procedure of this nation as a means of bringing persons accused of public offenses to trial. *Porter v. District Court, supra* at 257, 220 P.2d 1035. However, even though the origins of the Montana and the Federal systems be the same, they do not occupy the same position in the respective criminal justice systems. The Montana grand jury is a statutory body with a much narrower scope of authority than its counterpart in the Federal system. In the state,

"The inflexibility of the grand jury system, its cumbersome procedure and its technicalities brought about agitation for its abolition and the substitution of the system of prosecution by information." *Porter v. District Court, supra* at 257, 220 P.2d at 1039.

The proceedings and debates of Montana's first Constitutional Convention indicate that this was one reason Montana adopted the statutory process of information in bringing accused persons before the bar of justice.[5] But there was another reason behind the Montana movement to abolish the grand jury system of indictment and presentment.

"This is the secrecy of the proceedings, originally adopted as a part of the cloak protecting the subject from the tyranny of the sovereign, in later years came to be an instrument of malice and spite in the hands of cowardly and secretive informers." *Porter v. District Court, supra* at 258, 220 P.2d at 1040.

The Montana grand jury statutes have changed little since their enactment. It is essential that the distinction of the scope of

---

5. Article II, Section 20, Montana Constitution of 1972, provides a minor change from Article III, Section 8, 1889 Montana Constitution, in the number of jurors required for a grand jury and to return an indictment.

power and the breadth of inquiry between the Federal and Montana grand juries be kept in mind. Federal case law provides a source of authority establishing the minimum requirements of fairness the state must meet in proceeding by grand jury inquest. Federal cases do not establish authority for the scope of the state inquest except in those limited areas where the two systems are the same.[6] This distinction is crucial to both the plaintiff's claim and to the relief granted. To enjoin a federal grand jury would be to stop the federal criminal justice system cold in its tracks. Quite the opposite is true of the state system.

In Montana, the grand jury is limited to inquiring into public offenses triable in a specific county. Section 95–1405, R.C.M., 1947. The specific charge of this grand jury is set forth in an order of the Montana Supreme Court dated February 7, 1975:

"IT IS HEREBY ORDERED that a grand jury be drawn and summoned for the purpose of inquiring into public criminal offenses, committed or triable in Lewis and Clark County which relate to Workmen's Compensation Division . . matters; and also, for the purpose of inquiring into allegations of wilful and corrupt misconduct in office by public officers within the County of Lewis and Clark which relate to Workmen's Compensation Division matters."

The Montana Court early recognized the potential problem of the scope of this grand jury's inquiry. *State ex rel. Woodahl v. District Court*, 166 Mont. 31, at 43, 530 P.2d 780.

The immunity given a witness before the Montana grand jury is the second aspect of this claim that must be addressed.

In the federal system, immunity from prosecution may be granted under authority of 18 U.S.C. §§ 6002, 6003. This immunity is generally referred to as "use" immuni-

ty and precludes the use of compelled testimony, and evidence derived from such testimony, in a subsequent criminal proceeding against the witness. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Immunity thus afforded does not preclude prosecution for a crime about which testimony is compelled. *Matter of Grand Jury*, 524 F.2d 209, 219 (10th Cir. 1975).

▬ Montana employs the concept of "transactional immunity." By this theory, once the immunity is granted, the witness cannot be prosecuted for any transaction about which his testimony is compelled. The statute provides:

95–1807. *Compelling testimony: immunity from prosecution.* Before or during trial in any judicial proceeding a justice of the supreme court or judge of the district court, upon request by the attorney prosecuting or counsel for the defense, may require a person to answer any question or produce any evidence that may incriminate him. If a person is required to give testimony or produce evidence, in accordance with this section, in any investigation or proceeding he cannot be prosecuted or subjected to any penalty or forfeiture, other than a prosecution or action for perjury or contempt, for or on account of any transaction, matter or thing concerning which he testified or produced evidence.

A district court order to compel testimony pursuant to Section 95–1807 effectuates transactional immunity from prosecution. *Kelly v. Grand Jury*, 552 P.2d 1399, 33 St. Rept. 739, 742 (1976). The policy of Montana's transactional immunity statute is to aid prosecuting officers in the apprehension of criminals. *Kelly v. Grand Jury, supra.*

▬ There is an exception to the immunity from prosecution built into Section 95–1807, R.C.M., 1947, when the person granted

---

**6.** But see *In re Secret Grand Jury Inquiry*, Mont., 553 P.2d 987, 33 St.Rept. 781, wherein the Montana Supreme Court relies exclusively on federal case authority without addressing the question of the fundamental distinctions between the federal and state systems.

See also the dissent of Justice Haswell, 553 P.2d at 997, 33 St.Rept. at 793, where he states: "In my view, the majority opinion is not a declaratory judgment, binds no one, and it furnishes no precedent in future cases."

216

immunity commits perjury. When this occurs, the witness can be indicted. This exception to immunity is tied directly to those matters under investigation and concerning which the testimony is compelled. It does not relate to matters beyond the jurisdiction of the grand jury's lawful investigation of crimes. The perjury exception is not a license for a prosecutor or a grand jury to compel testimony or evidence and, once the useful information is obtained from the witness, to then seek an indictment for perjury by questioning on irrelevant matters in a manner designed to set up contradictory testimony.

The United States Supreme Court discussed the prosecutorial dilemma of whether to grant or deny immunity in the case of *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 1776, 48 L.Ed.2d 212 (1976). The case involves federal law but the principle is the same as that involved here.

 Absent the claim of privilege, the duty of a citizen to give testimony to a grand jury is absolute. When questioned, if the witness interposes his privilege, the grand jury has two choices. If the desired testimony is of marginal value, the grand jury can pursue other avenues of inquiry; if the testimony is thought sufficiently important, the grand jury can seek a judicial determination as to the bona fides of the witness's Fifth Amendment claims. If there is reasonable ground to fear danger to the witness from his being compelled to answer, the prosecutor must then determine whether the answer is of such overriding importance as to justify a grant of immunity to the witness. A decision of greater consequence is involved in the state proceedings because there the immunity decision affirmatively decided precludes prosecution.

Apparently, Kelly's testimony was thought to be of sufficient importance to be compelled. He was given immunity August 17, and was subsequently questioned. The record of that testimony and the striking

parallel of another case involving the Workmen's Compensation Division and a lawyer impel a conclusion that Kelly's indictment and prosecution for perjury "is likely." *Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

The most exacting statement of the relevance of the *Scanlon* case to the case at bar was the not-so-subtle threat of defendant Gilbert in a question put to Kelly.

Q [Mr. Gilbert] Mr. Kelly, isn't it a fact that you are well aware that the indictment that eventually issued against Jack Scanlon dealt in great part with Scanlon's alleged use of runners method of obtaining clients? You are aware of that and you have discussed that with your attorney. Well strike that.

But you are aware of that fact, isn't that correct?

A Would you rephrase the question, please.

Q Yes.

You are aware of the fact that Scanlon's indictment was based in large part upon his alleged perjured statements regarding the use of runners and how he obtained the clients?[7]

Kelly has propounded a theory involving his testimony before the grand jury which leads to but one end: a perjury indictment. Jack Scanlon is a Montana attorney who was compelled to testify before the grand jury. His practice involved the Workmen's Compensation Division. He, like Kelly, was investigated because of the high volume of compensation cases he handles. A number of his clients, former clients, and alleged runners were paraded before the grand jury and questioned about their relations with Scanlon. The testimony was then turned over to the Montana Commission on Practice for ethical violations, even before Scanlon appeared before the grand jury as a witness. Scanlon was then compelled to appear, at which time he claimed his consti-

7. Testimony of William Kelly, Tuesday, August 17, 1976, at 2:06 p. m.

It should be noted that the testimony involving Mr. Kelly is sealed, but was read in its entirety by the Court.

tutional privilege. He was given transactional immunity but then questioned about *ethical* matters having nothing to do with public criminal offenses committed or triable in Lewis and Clark County. Of the approximately 18,200 lines (647 pages) of testimony involving Scanlon before the grand jury, less than 200 involved the Workmen's Compensation Division matters. Gilbert's questioning left little doubt for the grand jury in any decision concerning perjury as the following examples illustrate.

Q So is there any legitimate way that you know of that Mr. Scanlon could have found out about your accident?

A Not legitimate
Tr. p. 19.

Q And while you had gotten some bi-weekly compensation, you had never got that real big chunk of money at the end of it?

A Right.

Q Kind of a pot of gold at the end of the rainbow?
Tr. p. 53.

A Also, we asked him to if this was right and he said there was nothing illegal about it.

Q Nothing illegal about what?

A About us putting a claim in on our industrial accident.

Q Okay. Did you ask him if there was anything illegal about his hunting you out?

A No.
Tr. p. 53.

Q Now, Mr. Scanlon magically appeared at your door, what did he have to say to you?
Tr. p. 59.

Q Mr. Scanlon, would you care to explain to the Grand Jury why you did not invoke the privilege against self-incrimination with respect to different claimants?
Tr. pp. 124–125.

Q Mr. Scanlon, are you aware now that the canons of professional ethics as adopted by the State of Montana pro-

hibited an attorney from soliciting persons to represent those persons as their attorney in a claim?

A Like I say, I can't answer any further questions relative to this matter on advice of my counsel, for the reasons previously stated.

Q I suggest to you, Mr. Scanlon, that the question as to whether or not you were aware of a particular law would be—could be answered by you. Do you still invoke the privilege with respect to that?
Tr. pp. 125–126.

Q I suggest to you, Mr. Scanlon, that there is no way that the question as to when you were admitted to the bar in the State of Montana could incriminate you. Do you feel to the contrary?
Tr. p. 126.

Q Mr. Scanlon, would you waive the attorney-client privilege and allow your attorney, Emmett Walsh to testify in front of this Grand Jury, so that he might explain the procedures that he is attempting to invoke?
Tr. p. 129.

Q And you communicated to Mr. Walsh our invitation to come in here and respond to questions if you waive the attorney-client privilege, did you not?

A Well, yes.

Q All right, and he declined to do that?

A Yes.

Q Did you ascertain from Mr. Walsh the fact that this motion has not yet been filed, but that he intends to now go down and file it? In my presence, didn't you—

A Like I say, I am instructed on advice of my counsel not to answer any further questions for the reasons previously stated.
Tr. pp. 130–131.

Q Mr. Scanlon, if you get trapped, it will be self-induced.
Tr. p. 200.

Q Mr. Scanlon, I am just curious. You don't feel you did anything wrong in the Lombardi case?

A No.

Q I mean, there is no question in your mind?

A No.

Q There is no way in the world that anybody could even suspect, from what you know, that you did anything wrong with Mrs. Lombardi? Tr. p. 207.

Q Well, being an attorney's reputation for honesty and candor is so important, didn't you want to clear that matter up? Tr. p. 208.

Q Now, I wonder why you have the waiver that we sent to Mr. Peterson in your possession, or why you even advised him not to sign it, or even suggested that he had the alternative not to sign it?

A Well, he does have the alternative. I wonder why you want to violate the privilege. If he doesn't want to sign it, that's his prerogative.

Q Of course, you know we never violate the privilege. The only person who can violate the privilege is the attorney.

A Not so. You can violate it when you harass and intimidate the witnesses. You certainly do violate the privilege.

Q Well, I have given you a chance to explain to the Grand Jury how Mr. Peterson was harassed or intimidated. You use those terms so freely. If you would care to explain them, be my guest.

A There is no need to explain them at this time. Until Mr. Peterson voluntarily signs the waiver, then I don't feel free to discuss the case. Tr. pp. 213–214.

Q Well, then, sir, would you explain to me on what basis you took the basis against self-incrimination when on February 4th I asked you about that case?

A On the advice of my counsel.

Q Well, I know your counsel wouldn't advise you to lie, and the only basis as a lawyer yourself, and you are a pros-ecutor and you know that the privilege against self-incrimination is so that a person will not be convicted from his own mouth; but there has to be some basis in fact to suggest either his guilt of a crime or a link in a chain of evidence against him, and that's why we have asked for you to be compelled to testify, that there will be immunity, and then we can discover these things. And I would like to know in particular what it was in the Dunks case that you felt would reflect badly.

A There is no reflection. There is no improprieties there. I just went ahead and claimed the privilege on the advice of my counsel, and I feel the same way about all of these cases. There were no improprieties.

Q Then would it be correct to say that each time you claimed the privilege against self-incrimination you did not do it because you felt the answer might incriminate you, but only because your counsel advised you you would be better off not to testify?

A Now, that's not the case at all.

Q Well, you just said—

A I said on the advice of my counsel, and that speaks for itself in the present proceedings.

Q What was the advice that your counsel gave you regarding not testifying?

A I will claim the attorney-client privilege on that. The record speaks for itself.

Q Would that be true also with the Koralewski case, nothing to your discredit?

A That's right. Tr. pp. 216–217.

Q Mr. Scanlon, you would do well to proceed with the truth, Mr. Scanlon, Because it has been noticeably absent from your testimony. Tr. pp. 282–283.

Q Mr. Scanlon, your testimony is at odds with every witness that has preceded you. Furthermore, your repre-

sentations that Dick Mullins referred Kathryn Smith was denied by Kathryn Smith over the phone last night. Your representation that Dick Mullins referred Thomas Dunks was denied by Thomas Dunks over the phone last night. Your representation that Terry Wilkerson referred Ida Lombardi was denied by Ida Lombardi over the phone last night. Your representation that Hermay Meyers referred you to Dolores Saylor was denied by Dolores Saylor over the phone last night. Somehow, Mr. Scanlon, your testimony seems to be somewhat suspect.

Tr. p. 283.

Q No, I guess you don't see any improprieties.

Tr. p. 284.

Q And you have heard a lot of explanations given by persons you have prosecuted, have you not?

A Yes.

Q You have heard them give explanations in regard to shoplifting, where they really didn't mean to take items, havent [sic] you?

A Well, I don't recall coming across any shoplifting cases.

Q Or in murder cases, where they didn't really mean to kill anybody, that they weren't there, that somebody else did it?

A I have only had one homicide case, and he admitted to the slaying.

Tr. p. 293.

Q Take them to trial. Or in your investigations, have you ever charged a defendant who was giving a not guilty plea—story, or prosecuted a man who got up on the stand and said he didn't do it and gave so much explanation?

Tr. p. 294.

Q What I am getting at, Mr. Scanlon— doesn't it seem to you that the stories you have been giving this Grand Jury about how you heard about these claims has the same ring of untruth that the stories that people you have prosecuted have given?

Tr. p. 294.

Q Mr. Scanlon, you do understand that you can't limit the scope of the inquiry. This Grand Jury is not limited. This Grand Jury can examine into any field.

Tr. p. 320.

Q Tell me, Mr. Wilkinson, doesn't it seem to you as a policeman who has interviewed a lot of people, who has talked to a lot of suspects, and has read a lot of phony stories, that that story (Scanlon's) doesn't ring true?

Tr. p. 514.

Q Isn't it true, Mr. Wilkinson, that Scanlon called you in yesterday, or talked to you in the last couple of days and said, 'Look, I gave your name as the one referring me to Lombardi. You have to cover for me.'

A No, he never asked me to do that.

Tr. p. 515.

There is a striking parallel between the grand jury questioning of Kelly and the grand jury questioning of Scanlon. Kelly's first grand jury appearance on May 25th, before immunity was granted, is, in essence, the same as that of Scanlon.

In the 217 pages of Kelly's testimony, after he was granted immunity, at most there are 10 pages dealing with the scope of crimes committed or triable in Lewis and Clark County. I should add, and not parenthetically, those questions are answered. In the rest of the testimony, Kelly was questioned about such matters as whether he sent Christmas cards to his clients and the professional canons of ethics.

At this point, it is necessary to reiterate that in the entire course of these proceedings this Court is the only Court to hear evidence and have before it the grand jury testimony of Kelly after he was given immunity. But, in *State v. Scanlon*,[8] Judge

8. Although *State v. Scanlon* is now before the Montana Supreme Court, that Court's jurisdiction is limited to legal questions. It is not a fact-finding body and will rarely overturn facts found by a district court unless an abuse of discretion is shown. Thus, the fact-finding of Judge Bennett is relevant to the case at hand.

Bennett examined the record and found sufficient abuse in the grand jury questioning to dismiss all of the perjury indictments returned against Scanlon. Judge Bennett captured the essence of the "handwriting on the wall" in this case in the opinion accompanying his order to dismiss the *Scanlon* perjury counts. The 647 pages of the *Scanlon* transcript presented one overriding concern.

"That concern arises from a clear and forceful impression derived from reading the transcript that the heavily dominant purpose of the prosecution was to lay the groundwork for indictment of the defendant, not to uncover crimes or misconduct in this county. A very heavy preponderance of the questions posed to the defendant particularly, could not possibly be construed as aimed in any way at unearthing crime or misconduct in the I.A.B. operations in Helena. They were cross-examinations questions clearly aimed at setting up conflict between the testimony of the defendant and that of the other witnesses.

"And yet the thread of legitimacy is there. A few of the questions searched out the possibility of crime or misconduct on the part of I.A.B. employees in Helena. Even one of the very few questions posed by the grand jury (which had to write for permission to ask a question, subject to censorship, apparently, by the prosecution) suggested a suspicion of hanky-panky between the defendant and an employee or employees of the I.A.B." *State v. Scanlon*, First Judicial District, No. 4108 (July 26, 1976).

The same sentiment can be expressed about the Kelly testimony. It appears that the dominant purpose of the prosecution, after Kelly was given immunity, is to set up a conflict in testimony so that Kelly would be subject to indictment for perjury. The preponderance of questions posed to Kelly does not address anything which could be construed as being directed at discovering

"public offenses" triable in Lewis and Clark County. Contrary to the impression of defendant Gilbert that

"This Grand Jury is not limited. This Grand Jury can examine into any field." Special Assistant Attorney General Howard M. Gilbert, Scanlon grand jury testimony, page 320.

the jurisdiction of the grand jury is limited to those matters triable in Lewis and Clark County.

The plaintiff in this case also claims there is bad faith and harassment involved in the way the grand jury is being conducted.

The most egregious example of the grand jury conduct is provided in the testimony, absolutely unrebutted, of Mr. Kent Kleinkopf, the administrative assistant to the Governor of the State of Montana.

June 19, 1975, at 10:55 o'clock a. m., Kleinkopf was served with a subpoena dated June 16. He was served by a person who identified himself with a badge as being an investigator for the Attorney General. The subpoena, issued three days earlier, commanded Kleinkopf to appear before the grand jury within five minutes. Kleinkopf was commanded to appear before the grand jury several times, though he never offered or gave testimony of substance. He was told he was "a suspect" but was led to believe that if he would proceed without the assistance of an attorney he would be given prior insight about the questions to be put to him before the grand jury.

A particularly disturbing occurrence transpired at one point after Kleinkopf had obtained an attorney. At the particular appearance, he was being questioned by Richard Dzivi, a special prosecutor:

Q And was there any conversation in that connection between you and Mr. Dvizi [sic] about that or were you excused?

A I read a statement at one point during the testimony in which when I was finished reading Mr. Dvizi asked me if this propaganda letter had been prepared by my attorney for me.

Q What did you do?

A Well, I was incredulous that he would say that before those people, and I didn't say anything. I just looked at my hands. And then he rephrased the question, and he said was this information prepared by your attorney with your knowledge, and I said it was prepared by my attorney with my knowledge and consent and with my full understand."

Tr. of Sept. 10, 1976, p. 87, ll. 5–17.

The reference to constitutional rights and statutory rights as "propaganda" raises a serious question of proprietous conduct. But the matter which moves the conscience of the Court even more is the facts of Kleinkopf's last appearance:

Q Then during one of your readings of the statements that you had prepared with counsel to the grand jury, did you have any particular unusual reaction from the grand jury?

A Yes, I did.

Q What was that?

A I was laughed at."

Tr. of testimony of Kent Kleinkopf of Sept. 10, 1976, p. 91, ll. 11–16.

The conduct of the special prosecutors and the apparent atmosphere of this grand jury are alien to our system of jurisprudence.

■ The terms "bad faith" and "harassment" connote purposeful actions and conduct motivated by a malicious or discriminatory purpose. *Maney v. Ratcliff*, 399 F.Supp. 760, 772 (E.D.Wis.1975). "Bad faith" generally means a prosecution brought without a reasonable expectation of obtaining a valid conviction, "harassment" having much the same meaning. But they can also mean the exercise of authority in such a manner as to be unnecessarily oppressive. *Timmerman v. Brown*, 528 F.2d 811, 815 (4th Cir. 1975).

■ My review of the evidence adduced in this action establishes a basis to believe, among other things, the following. Witnesses were intimidated by the special prosecutors' conduct in investigating alleged violations of criminal law and in the way witnesses were examined in the presence of the grand jury. This is succinctly expressed by William A. Pellegrini, when he responded to a question with the following answer:

A Well, they started asking me the same questions all over again that I'd answered the year before. But this time, though, there was an underlying—I don't know exactly how to put this, really—but as the conversation went along—let's put it like this—I felt I was being threatened, and I didn't know why. You know, to be threatened, you don't have to have somebody come right out and say "I'm going to do this to you" or "I'm not going to do this to you", or "You're going to do this" or "You're going to do that". You know, people can threaten you just by the way they act, the tone of their voice or a look in their eye. You know, I grew up in a place—well, in Anaconda—and I've never been exactly the docile type, so I've been in fights with different people in town, and I know when a guy is after my butt, so to speak. And that's just the definite impression I got from Mr. Gilbert.

Tr. of Deposition of Pellegrini, of Sept. 14, 1976, p. 5, l. 19, to p. 6, l. 3.

The special prosecutor approached Kelly, without the knowledge or consent of Kelly's attorney, and discussed Kelly's grand jury testimony. The state's prosecutors presented argument and evidence to the grand jury without the presence of a court reporter. The questioning of Kelly was far beyond the scope of legitimate grand jury inquiry in Montana. The questions asked after immunity have all the trappings of laying the groundwork for perjury. Kelly has been denied a factual hearing on his claims in state court.

Individually or together, these facts amount to an unnecessarily oppressive exercise of authority denying the plaintiff his constitutional right to the due process of law. At times, the due process clause of

the Fourteenth Amendment acts as a constitutional stop sign, controlling the traffic of the interaction between a state and her citizens, designed to impart caution and ensure fairness at significant junctures of that relationship. In extraordinary circumstances, the federal courts are called upon to stop the activities of the state. This case is one such instance.

## VIII.

■ A preliminary injunction should issue when there is a clear showing of sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Gresham v. Chambers*, 501 F.2d 687, 691 (2nd Cir. 1974):

> "If the balance tips decidedly toward the plaintiffs, and if plaintiffs have raised questions serious enough to require litigation, the injunction should issue." *Aguirre v. Chula Vista Sanitary Service and Sanitainer, Inc.*, 542 F.2d 779 at 781 (9th Cir., 1976).

The filing of a criminal information against any citizen can cause incalculable damage, regardless of the ultimate disposition at trial. The damage is exacerbated when a person whose livelihood depends to a great extent on his reputation for honesty, veracity and integrity, is indicted for perjury.

The Court must balance the state's interest in proceeding with the Workmen's Compensation investigation *by grand jury* against the plaintiff's right to be treated with fair process, free from the oppressive exercise of authority. The grand jury here is under no time limitation and its authority to investigate will not expire in the immediate future. Nor will its investigative powers be appreciatively thwarted pending a final consideration of the merits of this action. Any period of delay caused by the issuance of a preliminary injunction would not be so great as to hamper the orderly procedure of the grand jury.

The plaintiff will be subjected to irreparable harm if he is continually brought before the grand jury and questioned about matters substantially different from those acts for which he was given immunity. This is especially so when it appears that the questions asked are designed to create a conflict of testimony between the answers Kelly gives and what other witnesses have said, inevitably presenting a basis for a perjury indictment.

Therefore, IT IS ORDERED that the defendants file an answer to the complaint in this action within thirty (30) days of the receipt of this Opinion and Order.

## JUDGMENT

The Plaintiff, having filed his Complaint demanding a permanent injunction as more fully appears in the Complaint, and the Court having granted a preliminary injunction on October 4, 1976, the Plaintiff and Defendants having agreed upon a basis for the entry of a Judgment in this action, and having entered into a stipulation, the original of which is filed concurrently herewith with the Court, and upon due deliberation being had thereon, now, pursuant to the stipulation of the parties, it is

ORDERED, ADJUDGED AND DECREED that the Defendants, their duly elected and approved successors, and all persons acting by, through and for them, be, and they are hereby permanently restrained from proceeding in matters before the Grand Jury of Lewis and Clark County relative to William T. Kelly, and they are further restrained from enforcing the subpoena and subpoena duces tecum commanding William T. Kelly to appear before the Grand Jury.